# Third District Court of Appeal

## State of Florida

Opinion filed February 16, 2022.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D19-1690
Lower Tribunal No. F17-7072
_____


**Jonathan Matthew Aledda,**
Appellant,

vs.

**The State of Florida,**
Appellee.


An Appeal from the Circuit Court for Miami-Dade County, Alan Fine, Judge.


Schwartzreich & Associates, and Eric T. Schwartzreich (Fort Lauderdale); Bruno & Schoenthal PA, and Anthony J. Bruno II (Fort Lauderdale), for appellant.

Ashley Moody, Attorney General, and Jennifer A. Davis, Assistant Attorney General, for appellee.


Before SCALES, HENDON and MILLER, JJ.

SCALES, J.

Jonathan Matthew Aledda appeals his conviction for misdemeanor culpable negligence. We reverse and remand for a new trial because the trial court erred by refusing to allow Officer Aledda's SWAT commander, Assistant Police Chief Angel Rivera, to testify about the training Aledda received as to SWAT (special weapons and tactics) policy and procedures for a hostage rescue.

**I. Facts**

On the day of the incident, July 18, 2016, Aledda was a four-year veteran of the City of North Miami, Florida, police department. He was a certified SWAT officer. At approximately 5 p.m. on that day, Aledda responded to a dispatch call about a man with a gun at the intersection of NE 127th Street and 14th Avenue. Aledda was one of thirteen North Miami police officers (ten at the scene, three on the perimeter) who responded to the call. Sitting in that intersection was Arnaldo Rios-Soto, a man with severe developmental disabilities. He had just run from his nearby group home carrying a silver toy truck in his hand. His caretaker, Charles Kinsey, had followed him to the intersection. Kinsey stood over Rios-Soto and directed traffic around him.

The first two officers to arrive were Officers Crespo and Bernadeau. They retrieved their rifles but kept their distance. Kinsey raised his hands in

2

the air and told the officers that Rios-Soto was holding a toy. Eventually, on Officer Crespo's command, Kinsey joined Rios-Soto on the ground where Kinsey alternately sat up and lay prone. Throughout, Rios-Soto rocked back and forth and played with the toy truck.

Additional officers arrived, including Aledda, and took up positions in various locations around the scene. Each officer testified at trial about what he or she saw. They described their different perceptions, from different distances and angles, of Rios-Soto and what Rios-Soto held in his hand. Radio dispatches were not definitive as to whether Rios-Soto had a gun, and there was testimony about intermittent radio malfunction.

When Aledda arrived at the scene, he took his assault rifle from the trunk of his car and, asking other officers to "cover" him, maneuvered himself to within 152 feet of Rios-Soto and Kinsey. The officer closest to Aledda, Officer Warren, told Aledda that the object in Rios-Soto's hand looked like a gun but he was not certain. Over the radio, Aledda heard another officer, Commander Hollant, say that it looked like Rios-Soto was loading a gun. This comment confirmed Aledda's own perception that Rios-Soto had a gun. Aledda believed that he was observing a hostage situation, and that Rios-Soto was armed with a gun and was holding Kinsey hostage.

3

Aledda advised dispatch that he had a clear shot and sought supervisor advice as to whether to fire. Aledda did not receive a response to his radio inquiry. In its sentencing order, the trial court summarized the radio broadcasts this way: "Before Officer Aledda fired his rifle, the information broadcast over the police radio was that there was a report of a gun, that it looked like a gun, that it appeared as if Arnaldo Rios-Soto was loading his weapon, that the other subject [Kinsey] said it was not a gun and from a visual an officer [Bernadeau] said it did not appear to be a gun." Officer Bernadeau made this remark right after Aledda said he had a clear shot, but Aledda apparently did not hear Bernadeau.

Aledda watched Rios-Soto's rocking movements, his holding the object in his hand, and his angry demeanor. He saw Rios-Soto raise the object toward the closest officer, Crespo, then swing the object toward Kinsey. Believing the object was a gun and Kinsey was in imminent danger of being shot, Aledda fired three shots at Rios-Soto. He missed. One shot hit Kinsey in the right hip. No other police officer fired a weapon.

## II. Procedural History

The State charged Aledda with two felony counts of attempted manslaughter with a deadly weapon, one misdemeanor count of culpable negligence for inflicting injury upon Kinsey, and one misdemeanor count of

culpable negligence for endangering Rios-Soto. At a first trial in March 2019, the jury acquitted Aledda of culpable negligence as to Rios-Soto, but could not reach a verdict on the remaining counts, resulting in a hung jury and a mistrial.

In June 2019, Aledda stood for a second trial on the three remaining counts. During this second trial, Aledda sought to introduce testimony by Assistant Police Chief Rivera as to Aledda's SWAT training. Rivera had trained Aledda. The State objected. The trial court requested a defense proffer of the intended witness testimony. Aledda's counsel provided the following proffer: "There're three criteria when firing in a hostage situation. The police officer reasonably believes that the subject has a hostage. . . . [T]he subject indicates through words or actions he may do harm to the hostage. . . . [T]the officer has a reasonable belief that [the subject] has the means and the ability to carry out the threat." The trial court sustained the State's objection, concerned about possible jury confusion if presented with a standard seemingly different from the one contained in the jury instructions for the charged crimes.

Ultimately, the jury acquitted Aledda on the two attempted manslaughter counts but convicted him of misdemeanor culpable negligence

5

as to Kinsey. The trial court sentenced Aledda to one year of probation (with special conditions). This appeal timely followed.

**III. Analysis**

While Aledda makes several arguments on appeal, we find that one – the trial court's refusal to allow Rivera to testify as to Aledda's SWAT training regarding hostage procedures – has merit and requires us to reverse Aledda's conviction for the crime of culpable negligence.

*A. The crime of "culpable negligence"*

Our analysis begins with dissecting the culpable negligence charge at issue. Section 784.05(2) of the Florida Statutes (2016) provides, in relevant part, as follows: "Whoever, through culpable negligence, inflicts actual personal injury on another commits a misdemeanor of the first degree." While the term "culpable negligence" is not statutorily defined, Florida's standard criminal jury instruction 8.9, which was given to the jury, provides the following definition of "culpable negligence":

> I will now define "culpable negligence" for you. Each of us has a duty to act reasonably toward others. If there is a violation of that duty, without any conscious intention to harm, that violation is negligence. But culpable negligence is more than a failure to use ordinary care for others. In order for negligence to be culpable, it must be gross and flagrant. Culpable negligence is a course of conduct showing reckless disregard for human life, or for the safety of persons exposed to its dangerous effects, or such an entire want of care as to raise a presumption of a conscious indifference to consequences, or which shows wantonness or

6

recklessness, or a grossly careless disregard for the safety and welfare of the public, or shows such an indifference to the rights of others as is equivalent to an intentional violation of such rights.

There is no uniform schedule of specific acts that constitute culpable negligence. Rather, "[c]ulpable negligence is the omission to do something which a reasonable, prudent and cautious man would do, or the doing of something which such a man would not do *under the circumstances surrounding the particular case*." Russ v. State, 191 So. 296, 298 (Fla. 1939) (emphasis added). While, at first blush, Russ's culpable negligence definition may look somewhat similar to the textbook tort definition of "negligence," the degree of negligence required to sustain a conviction for the crime of culpable negligence is significantly higher than that necessary to sustain a recovery of compensatory damages in a tort case. State v. Greene, 348 So. 2d 3, 4 (Fla. 1977). Indeed, as Russ instructs, a culpably negligent defendant must have engaged in a degree of negligence "at least as high as that required for the imposition of punitive damages in a civil action." Russ, 191 So. at 298. Therefore, to sustain a conviction for the crime of culpable negligence, the State must establish that the defendant acted with "a gross and flagrant character, evincing reckless disregard for human life" or an "entire want of care which would raise the presumption of indifference to consequences; or such wantonness or recklessness or grossly careless

7

disregard of the safety and welfare of the public, or that reckless indifference to the rights of others, which is equivalent to an intentional violation of them." Id. As Russ also instructs, though, the defendant's conduct is not viewed in a vacuum, but rather, through the prism of "the circumstances surrounding the particular case." Id.

In practical terms, when prosecuting a criminal culpable negligence case, the State generally presents evidence of the defendant's conduct and the jury, drawing from its collective experience, decides whether such conduct warrants a criminal conviction. See Pitts v. State, 473 So. 2d 1370, 1372 (Fla. 1st DCA 1985) ("The dividing line between the lack of care required for proof of vehicular homicide by reckless operation of a motor vehicle . . . and careless driving . . . is obviously hard to draw . . . . [W]e hold that the assessment of the defendant's actions was properly left to the jury."). We agree with the State that, when asked to determine whether a defendant's conduct constitutes criminal culpable negligence, the jury employs an objective, rather than a subjective, standard, i.e., the jury must decide what a reasonable person would do "under the circumstances surrounding the particular case." Russ, 191 So. at 298. In many culpable negligence cases, a jury is able to determine what a reasonable person would do because the circumstances surrounding the case are not so foreign

8

to it as to warrant the introduction of evidence regarding how a defendant is trained to respond to particular circumstances. Indeed, almost by definition, many culpable negligence cases – where the State must prove that the lay defendant acted with a wanton or reckless disregard for the public – do not involve a trained professional charged with failing to exercise that degree of skill, care or judgment as is ordinary and reasonable for one engaged in the given profession. Here, though, such a scenario is presented. The training undertaken by the professional would be relevant for the jury to consider in determining how and why the professional assessed and responded to the situation, and whether, under the circumstances surrounding the particular case, such assessment and response was objectively reasonable.

*B. The culpable negligence charge against Aledda and Aledda's theory of defense*

In this case, Aledda, within the course and scope of his employment as a police officer, was called to a scene of presumed criminal activity. The State alleged that Aledda's assessment of the circumstances, and his response thereto, constituted such recklessness as to inculpate Aledda. Aledda asserts that his assessment of, and response to, those circumstances were dictated by his specific training. This, however, is not a commonplace culpable negligence case. There was no contention that

9

Aledda was acting outside the scope of his employment as a law enforcement officer. Instead, the State alleged that Aledda's action in firing his weapon grossly departed from what was ordinary and reasonable for a law enforcement officer confronting such circumstances. While a jury may rely generally upon its collective experience in assessing the reasonableness of a defendant's conduct, in this instance, Aledda contended that the degree of skill, care, judgment, and training he was required to exercise could not easily be measured by laypersons. Indeed, Aledda's theory of defense was that his assessment of the situation, and his resulting actions, were based upon and consistent with his training as a SWAT officer, and that he was acting to protect, rather than to evince a reckless disregard for, human life.

While the State was allowed to present evidence as to how other officers on the scene responded to the situation, and how "shocked" those officers were that Aledda fired his weapon, the trial court's challenged evidentiary ruling precluded Aledda from presenting a key ingredient of his defense. Under the facts and circumstances of this case, we conclude that precluding Rivera's testimony constituted reversible error, and that Aledda should be afforded a new trial. Sluyter v. State, 941 So. 2d 1178, 1180 (Fla. 2d DCA 2006) ("A party is entitled to present evidence upon the facts that

10

are relevant to his theory of the case, so long as that theory has support in the law." (quoting Zamora v. State, 361 So. 2d 776, 779 (Fla. 3d DCA 1978))).

### C. Distinguishing *Pitts* and *Lozano*

The State argues that two cases – Pitts v. State, 473 So. 2d 1370 (Fla. 1st DCA 1985) and Lozano v. State, 584 So. 2d 19 (Fla. 3d DCA 1991) – compel affirmance. From the record, it appears that the trial court, at least in part, premised its challenged evidentiary ruling on these cases. While both of these cases involve an on-duty police officer being criminally charged for the officer's conduct in the line of duty, both cases are dispositively distinguishable from our case.

### 1. The *Pitts* case

In Pitts, an Alachua County sheriff's deputy (Carl Michael Pitts) responded to a fellow officer's request for backup at the scene of a possible burglary. On his way there, Pitts failed to inform dispatch that he was traveling to the scene with his blue lights and siren on. As Pitts approached the scene, he turned off the siren so as not to call attention to his arrival. As he passed a car in a no-passing zone, Pitts collided with an oncoming car and killed its driver. Pitts, 473 So. 2d at 1372. Pitts was charged with vehicular homicide. At his trial, the State was permitted, over objection, to

11

introduce excerpts from a Sheriff's Office manual that required a police officer to notify dispatch, as Pitts had failed to do, if an officer was responding with his blue lights and siren on. Id. at 1373.

The First District reversed Pitts's conviction, concluding that the trial court erred in allowing the State to introduce excerpts from the departmental manual. Id. at 1373-74. The Court opined that the excerpts lacked any probative value for two reasons: (i) there was no evidence linking how the officer's failure to comply with the policy caused the accident; and (ii) the excerpts "introduced a false standard in the measure of reckless driving." Id. at 1374. The Pitts court concluded that the excerpts were irrelevant to show whether Pitts had violated the criminal statute with which Pitts had been charged. Id.

2. The Lozano case

In Lozano, a City of Miami police officer (William Lozano) heard the siren and saw the flashing emergency lights of an approaching police vehicle in pursuit of a motorcycle for a traffic violation. Lozano shot and killed the motorcycle operator, and the motorcycle passenger died in the resulting crash. Lozano was charged with two counts of manslaughter. Lozano, 584 So. 2d at 20-21. At Lozano's trial, the State was permitted, over objection, to introduce testimony regarding police department policies that tended to

12

show Lozano's actions were violative of such policies. Specifically, the policies introduced to the jury imposed upon officers a duty to seek a place of safety and retreat from danger and proscribed the use of a firearm against a moving vehicle. Id. at 21, 24.

Citing Pitts, we reversed Lozano's conviction, concluding somewhat summarily that "the rule regarding the admissibility of custom in civil cases is not applicable in a criminal case." Id. at 24.

3. Distinguishing Pitts and Lozano

The Pitts and Lozano courts overturned convictions of police officers who had been charged with vehicular homicide (Pitts) and manslaughter (Lozano) for actions undertaken by the defendant officers while in the line of duty. The trial courts in both cases had allowed *the State* to introduce policy manuals to show that the officers' conduct was violative of department policies. In rather unremarkable holdings, the appellate courts concluded that it was error to allow the State to introduce such evidence, because the relevant inquiry in criminal cases is whether the State has proven a violation of a statute, not whether a defendant has violated a custom or policy. Two important factors, though, distinguish these cases from the instant case.

First, in this case, it was Aledda, and not the State, who proffered the testimony. This is an important distinction because of the relative burdens of

13

the parties. The State's burden in a criminal prosecution is to prove that the defendant violated every element of the charged criminal statute. Dausch v. State, 141 So. 3d 513, 517 (Fla. 2014). The Pitts court, and, to a lesser extent, the Lozano court, concluded that introduction of excerpts from department manuals confused the jury by suggesting the State had to meet a different burden. Pitts, 473 So. 2d at 1373-74; Lozano, 584 So. 2d at 24 n.8, 9. Unlike in Pitts and Lozano – where the introduction of the policy manuals' excerpts allowed the jury to convict Pitts and Lozano criminally for violation of the policies – Aledda sought to introduce Rivera's testimony to establish how Aledda was trained as a SWAT officer to assess and respond to the situation presented in this case. This evidence certainly was relevant to assist the jury in its determination of whether that assessment and response by Aledda constituted a "course of conduct showing reckless disregard for human life, or for the safety of persons exposed to its dangerous effects, or such an entire want of care as to raise a presumption of a conscious indifference to consequences." Fla. Std. J. Inst. (Crim.) 8.9.

How Aledda was trained, and the extent to which his actions were consistent with his training, *directly* relate to whether Aledda properly or negligently responded to the circumstances with which he was confronted. Such was not the case in Pitts, where the State established no nexus

between the policy provision introduced to the jury (a requirement that dispatch be notified when responding to a call with lights and siren on) and the crime for which Pitts was charged (vehicular homicide). While the department policies introduced in Lozano might have had a greater nexus to the crimes with which Lozano was charged, this Court was understandably concerned that introduction of the policies might have allowed the jury to convict Lozano for failure to follow department policies, rather than for violation of the criminal statutes with which he was charged.

Aledda did not offer the testimony regarding his training to establish a standard different from one created by the criminal statute; he offered the testimony to show how he was trained to react to the precise situation with which he was confronted. Thus, the introduction of Rivera's testimony regarding Aledda's training would assist – rather than confuse – the jury in determining whether Aledda's response to the circumstances he encountered was criminally negligent.

Second, the evidence sought to be introduced by Aledda is not the same as the evidence excluded in Pitts and Lozano. The trial courts in both Pitts and Lozano allowed the State to present testimony relating to specific regulations contained in department manuals. Pitts, 473 So. 2d at 1373; Lozano, 584 So. 2d at 24. The Pitts court characterized this evidence as "a

15

standard promulgated by some unknown person in the Sheriff's Office." <u>Pitts</u>, 473 So. 2d at 1374. Obviously, the defendants in <u>Pitts</u> and <u>Lozano</u> could not cross-examine regulations contained in policy manuals. Aledda did not seek to introduce regulations contained in a department manual. Rather, Aledda sought to introduce live testimony of the SWAT commander who trained Aledda on how to respond to the specific situation Aledda faced at the scene. Rivera would have been subject to cross-examination, allowing the State to clarify any issues arising from Aledda's direct examination of Rivera and to explore any biases relevant to Rivera's testimony.

## IV. Conclusion

We conclude that the trial court erred by not allowing Aledda – charged by the State with culpable negligence for his assessment of and response to a crime scene – to introduce testimony regarding how Aledda was trained to assess and respond in such circumstances.

Reversed and remanded for a new trial.